# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| IFC CREDIT CORP., | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 04 C 5905 ) |
| UNITED BUSINESS & INDUSTRIAL FEDERAL CREDIT UNION, | ) ) ) |
| Defendant. | ) ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

IFC Credit Corporation (IFC) sued United Business & Industrial Federal Credit Union (UBI) for breach of contract and fraud relating to an equipment lease between UBI and NorVergence, Inc., which NorVergence assigned to IFC. A jury found for UBI on both claims.

IFC has moved for judgment as a matter of law on its breach of contract claim and for a new trial on both claims. It has also moved to supplement the record in certain respects relating to purported objections to jury instructions. For the reasons stated below, the Court grants IFC's motion to supplement the record but denies its motions for judgment as a matter of law and for a new trial.

### Background

UBI is a credit union based in Connecticut. In 2003, UBI negotiated with NorVergence to obtain telecommunications services and equipment. UBI's chief information officer Michael Knurek, who testified at trial, stated that he handled the discussions with NorVergence. Knurek testified that he obtained a GED and attended one year of college and had worked with

computers ever since. He also stated that he has a learning disability that he "seem[s] to overcome."

Knurek stated that NorVergence promised to provide UBI "no-risk" Internet access, telephone service, and cellular phones, at a significant savings compared to UBI's then-current services. On December 12, 2003, Knurek signed five contracts in which UBI agreed to a sixth month lease for five "Matrix boxes," equipment that NorVergence represented enabled it to supply low-cost telecommunications services. Pl. Exs. 1, 14, 23, 33, 44. Each of the leases contained a waiver of defenses provision and a so-called "hell or high water" provision making the obligation to pay unconditional despite equipment failure or other problems. These provisions, reproduced in their approximate actual size from the back of the leases, read as follows (the documents offered in evidence were far blurrier than what appears below):

> YOUR DUTY TO MAKE THE RENTAL PAYMENTS IS UNCONDITIONAL DESPITE EQUIPMENT FAILURE, DAMAGE, LOSS OR ANY OTHER PROBLEM. RENTER IS RENTING THE EQUIPMENT "AS IS", WITHOUT ANY WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE IN CONNECTION WITH THIS AGREEMENT. If the Equipment does not work as represented by the manufacturer or supplier, or if the manufacturer or supplier or any other person fails to provide service or maintenance, or if the Equipment is unsatisfactory for any reason, you will make any such claims solely against the manufacturer of supplier or other person and will make no claim against us.
> 
> . . .
> 
> YOU UNDERSTAND THAT ANY ASSIGNEE IS A SEPARATE AND INDEPENDENT COMPANY FROM RENTOR / MANUFACTURER AND THAT NEITHER WE NOR ANY OTHER PERSON IS THE ASSIGNEE'S AGENT. YOU AGREE THAT NO REPRESENTATION, GUARANTEE OR WARRANTY BY THE RENTOR OR ANY OTHER PERSON IS BINDING ON ANY ASSIGNEE, AND NO BREACH BY RENTOR OR ANY OTHER PERSON WILL EXCUSE YOUR OBLIGATIONS TO ANY ASSIGNEE.

*See, e.g.,* Pl. Ex. 1.

Knurek testified that the NorVergence representative "shov[ed] a lot of papers at me" and that he understood he was signing an "application for telecommunications services." He stated that he had a hard time reading the terms of the leases because the print was so small and that when he pointed this out, the NorVergence representative assured him that the documents were "standard lease agreements." Knurek stated that he had never heard of a waiver of defense clause or a hell or high water clause, nor did the NorVergence representative tell him the leases

2

contained such provisions. Knurek testified that he understood that UBI could terminate the leases if the equipment did not work. Knurek testified that had he known he was giving up any rights he might have against NorVergence, he would not have signed the leases. Knurek stated that he was unaware that NorVergence had already entered into an agreement to assign the leases to IFC.

On January 9, 2004, the Matrix boxes were installed at UBI's offices. The boxes did not work properly. The installer nonetheless asked Knurek to sign delivery and acceptance certificates. Knurek refused to do so. The installer called NorVergence's installation coordinator, who then spoke with Knurek. Knurek advised that the equipment was not in working order. The NorVergence representative told Knurek that signing the certificates indicated only that the equipment had been installed, and that if Knurek did not sign, the installer would have to remove the equipment, which would delay the process and jeopardize the low price NorVergence had guaranteed. The representative assured Knurek that the service would begin within sixty days and that signing the certificates was just "standard procedure."

Relying on what the NorVergence representative stated, Knurek signed the certificates, which stated:

> The undersigned certifies that it has received and accepted all the Equipment described in the Equipment Rental Agreement between NorVergence, Inc. (Rentor) and the undersigned United Business & Industrial Federal Credit Union (Renter) dated 12/12/03. The Equipment conforms with our requirements. **There are no side agreements or cancellation clauses given outside the Equipment Rental Agreement.**
>
> I have reviewed and I understand all of the terms and conditions of the Equipment Rental Agreement. **I AGREE THAT THE RENTAL PAYMENT UNDER THE EQUIPMENT RENTAL AGREEMENT WILL BEGIN 60 DAYS FROM THE DATE OF THIS DELIVERY AND ACCEPTANCE CERTIFICATE AND SHALL CONTINUE THEREAFTER FOR THE**

> **FULL LENGTH OF THE STATED INITIAL TERM OF THE EQUIPMENT RENTAL AGREEMENT AND IN ACCORDANCE WITH ITS TERMS AND CONDITIONS.** I was not induced to sign this by any assurances of Rentor or anyone else. I have had a reasonable opportunity to inspect the goods.

Pl. Ex. 2 (emphasis in original).

On January 12, 2004, NorVergence assigned the leases to IFC, which leases equipment and purchases existing leases. Beginning in March 2004, Robert Wolfeil of IFC began calling Knurek regarding the rental payments for the Matrix boxes. Knurek told Wolfeil that the equipment was defective and then called NorVergence, which agreed to pay UBI's bills. On June 30, 2004, however, NorVergence was forced into involuntary bankruptcy and stopped paying UBI's rental payments. Wolfeil again contacted Knurek and asked UBI to make its payments, but UBI refused because the equipment still did not work.

IFC sued UBI for breach of contract, claiming that it was owed $113,098.20 in payments on the leases, and for fraud, claiming that UBI had defrauded IFC in signing the delivery and acceptance certificates for the equipment. Prior to trial, the Court denied IFC's motion to strike UBI's jury demand, a matter to which the Court will return shortly.

At trial, the jury was given instructions regarding IFC's claims to which both sides had agreed, as the Court will discuss below. The jury was told, first, that IFC had to prove that UBI had failed to perform its obligations under the leases. It was next explained that UBI had raised three defenses but that IFC disputed UBI's entitlement to raise two of them. The first defense, which according to the instructions the parties agreed UBI was entitled to argue, required UBI to prove that "it signed the contracts as a result of fraud that induced UBI to sign the contracts without knowledge of, or a reasonable opportunity to learn of, the character or essential terms of

the contracts." Tr. 463-64 (Aug. 4, 2006). In this decision, the Court will refer to this defense as UBI's fraud *in factum* defense. The jury instructions provided a list of factors the jury could consider in determining whether UBI had proved this defense. Tr. 464 (Aug. 4, 2006).

The agreed instructions advised the jury that IFC disputed UBI's right to argue its two remaining defenses. The jury was told that IFC was entitled to enforce a provision of the leases barring UBI from asserting these defenses against IFC, unless UBI proved that IFC had not acquired the leases for value, had not acquired them in good faith, or acquired them with notice of UBI's fraud *in factum* defense. The instructions then advised what UBI had to prove to prevail on these defenses if it persuaded the jury that it was entitled to assert them against IFC. One of the defenses was a "fraud in the inducement" defense. Tr. 467-68 (Aug. 4, 2006).

With the agreement of both sides, the jury was given a special verdict form that had particularized questions corresponding to each of the issues the jury might be called upon to decide. The jury found that IFC proved that UBI breached the contracts by failing to pay, but that UBI proved that "it signed the contracts as a result of fraud that induced it to sign the contracts without knowledge of, or a reasonable opportunity to learn of, the character or essential terms of the contracts." Tr. 476 (Aug. 4, 2006); Verdict Form.

## Discussion

**1.      Motion to supplement the record**

IFC moves to supplement the record to reflect that it first objected to UBI's proposed fraud *in factum* instruction on July 27, 2006; the Court found the leases were "finance leases" as defined in the Uniform Commercial Code; IFC proposed two additional instructions on August 3, 2006; and the Court rejected those instructions.

The evident purpose of IFC's motion is to allow it to argue that it preserved certain objections to the jury instructions; that the instructions were erroneous; and that it is entitled to a new trial as a result. The problem with supplementing the record as IFC requests is that it would result in an incomplete and misleading picture of what occurred at trial with respect to the jury instructions. The Court will therefore grant IFC's motion but will further supplement the record on its own motion to ensure that the full story is presented.

Prior to trial, each side submitted proposed jury instructions to the Court, along with objections to the other side's proposed instructions. On July 27, 2006, UBI submitted some amended and supplemental proposed instructions, including an instruction regarding fraud *in factum*. That same day, IFC submitted to the Court, via e-mail, objections to UBI's additional instructions. IFC's first request to supplement the record concerns its making of these objections; the Court grants the request.

At the outset of the trial, the Court gave the jury preliminary substantive instructions after the parties vetted them thoroughly. The Court advised the jury that these instructions were preliminary and that if the instructions given at the end of the case differed, the final instructions were controlling.[1]

During the trial, the Court described to the parties its usual procedure for conducting jury instruction conferences in civil cases. The Court typically conducts the initial conference in chambers, without the court reporter, after the conclusion of a court day or before the start of a court day (or both, if necessary). Prior to that in-chambers conference, the Court distributes a set

---

[1] The jury was not given copies of the preliminary instructions but was given copies of the final instructions.

of proposed jury instructions, derived from the proposals submitted by the parties. At the in-chambers conference, the Court considers objections and comments by the parties and produces a final set of jury instructions, which are then distributed to the parties. Before closing arguments – and after giving both sides time to think further – the Court gives the parties an opportunity to put on the record any objections to the instructions and rules on those objections. In the Court's experience, it is fairly common for lawyers to make comments or objections during the initial, in-chambers conference but not to make them on the record later, when given the opportunity to do so – either because they are satisfied with the Court's resolution of the issue, have reconsidered, or for other reasons do not wish to preserve the point for appeal.

During the trial in the present case, the Court described this procedure to counsel as follows, referring to the proposed jury instructions that were to be distributed:

> I have something coming to me from my law clerk, and what I expect to give you at the end of the day is a more complete set. Then what I'd like to do is have you come in to chambers tomorrow morning at . . . . Let's say 8:45. We'll discuss the instructions without the court reporter. We'll get them all in order, and then we'll put any objections on the record later.

Trial Tr. 263 (Aug. 2, 2006). Later the same day, the Court again referred to the proposed instructions that it had distributed and to the in-chambers instruction conference set to take place the next morning. Trial Tr. 311 (Aug. 2, 2006).

The following morning, when proceedings in the courtroom began, the Court made reference to the just-conducted in-chambers conference. The Court indicated that at the conference, IFC had "tossed . . . a curveball," specifically a proposed instruction in which it sought to advise the jury that UBI's leases were "finance leases" under Article 2A of the Uniform Commercial Code. Trial Tr. 315 (Aug. 3, 2006). The Court indicated that when the

7

preliminary jury instructions had been discussed prior to trial, IFC had not objected to them on the ground that they were inconsistent with its position that the leases were "finance leases." Trial Tr. 316 (Aug. 3, 2006).

A discussion ensued regarding what defenses UBI could assert if, in fact, the leases were determined to be finance leases. UBI took the position that it still would be able to assert the fraud *in factum* defense that it had been presenting at trial; IFC took the position that the fraud *in factum* defense would no longer exist. Trial Tr. 320-23 (Aug. 3, 2006). After further discussion, the Court determined that the jury instruction conference would continue that afternoon, and closing arguments would be given the next morning. Trial Tr. 326 (Aug. 3, 2006). After the testimony was concluded, and after excusing the jury, the Court directed counsel to return later in the afternoon for the continued instruction conference and asked them, in the meantime, to give further thought to whether the fraud *in factum* defense would apply if the leases were ruled to be "finance leases." Trial Tr. 388 (Aug. 3, 2006).

The jury instruction conference resumed in chambers later in the afternoon – as before, without the court reporter present. The Court advised the parties at the conference that it had concluded that the leases were, in fact, "finance leases."[2] IFC also submitted two additional proposed instructions: one stating that "[t]he law presumes that a party who signs a contract knows its terms and consents to be bound by them" and another stating that "[a] party's failure to read a contract does not amount to entering into a contract without knowledge of, or a reasonable opportunity to learn of, the character or essential terms of the contract." The Court indicated that

---

[2] This is the second matter on which IFC seeks to supplement the record. The motion is granted, though the Court notes that the instructions themselves reflected that the parties agreed that the leases were "finance leases." Tr. 463 (Aug. 4, 2006).

it was inclined to reject these proposed instructions because they were argumentative and unnecessary. (These are the second, third, and fourth matters as to which IFC asks to supplement the record; the Court grants the request.)

At the same in-chambers conference, there was further discussion about whether the fraud *in factum* defense applied in light of the Court's determination that the leases were "finance leases." Counsel for IFC indicated that they believed, but were not certain, that the defense might well apply. It became clear to the Court, however, that the parties were not fully prepared to discuss the point or, more importantly, to finalize the jury instructions. The Court recessed the conference, directing counsel to confer and attempt, to the extent possible, to come up with agreed-upon jury instructions and submit them to the Court by e-mail later in the afternoon. The Court indicated that it would rule on any remaining disputes before closing arguments the next morning.

Later that afternoon – just before 6:00 p.m. – IFC's counsel sent the Court (with a copy to UBI's counsel) an e-mail which read as follows: "Attached please find IFC and UBI's joint submission for the proposed jury instructions in Word Perfect and PDF and joint submission on the Verdict Form in Word. Please let us know if you need anything further." *See* Court's Suppl. Ex. A.[3] The attachment to counsel's e-mail included an *agreed* set of jury instructions on IFC's breach of contract claim, together with an *agreed* verdict form, both of which included UBI's fraud *in factum* defense. Though the Court did not save a copy of the agreed instructions submitted by IFC's counsel, their content can be ascertained from the red-lined version the Court

---

[3] The Court is supplementing the record with Court's Supplemental Exhibits A and B, which are discussed in the body of this decision.

sent the parties the next morning. *See* Court's Suppl. Ex. B.

The Court first saw IFC's counsel's e-mail and the agreed instructions at home later in the evening. Because the Court wanted to be certain that what IFC's counsel submitted was an agreed set of instructions, it sent both sides' counsel an e-mail which read as follows:

> Just so I'm clear, are both in agreement with the revised version? If so, I'm OK with that, though I may tweak it [in] one or two spots to make it a bit clearer.
>
> Same question on the draft verdict form - again, I'm OK with it if both sides agree, but I may tweak it a bit so that it conforms a bit more closely to the sequence of the issues contained on the revised jury instruction.
>
> Whoever may happen to get this before you come to court in the a.m., please let me know. I will send you my tweaked version by about 8 a.m.

Court's Suppl. Ex. A.

The following morning, around 8:15 a.m., the Court sent both sides' counsel an e-mail with some relatively minor revisions to the agreed instructions on IFC's breach of contract claim. The Court has included in the record the red-lined version sent to the parties. Court's Suppl. Ex. B. From the red-lining and strike-outs, it is readily apparent that the agreed instructions that IFC's counsel had sent the Court on August 3 *specifically permitted* UBI to assert its fraud *in factum* defense.

Once the Court called the case for the morning session on August 4, it gave both sides an opportunity to put on the record any objections they had to the final version of the jury instructions:

> The Court: First of all, I want to thank the parties for all the work that you did to get the jury instructions in order after our conference last night. I made some additional edits to it, did some work on the verdict form. Has either side been – and [IFC's counsel] picked up a typo, which I'm correcting. Does either side have any problems with any of the jury instructions?

10

> IFC counsel:   I think other than that, we're fine with them.
>
> The Court:   You said there was an issue you wanted to raise?
>
> UBI counsel:   There's two things. One is that I want to make sure that the record reflects that we object to your finding about it being a lease.
>
> The Court:   Yes.

Trial Tr. 391 (Aug. 4, 2006).

In short, IFC's counsel reaffirmed on the record, without equivocation or ambiguity, that IFC *agreed* to the instructions being submitted to the jury – which included the fraud *in factum* defense. After this colloquy, the parties gave their closing arguments, and the Court instructed the jury, using the agreed-upon instructions.

**2.     Motion for judgment as a matter of law**

IFC has moved for judgment as a matter of law, arguing that the evidence at trial "overwhelmingly supports" its contention that the jury should not have found in UBI's favor on its fraud *in factum* defense. As a result, IFC contends, the contracts' "hell or high water" clauses were enforceable as a matter of law, eliminating any possible defenses to payment.

When "there is no legally sufficient basis for a reasonable jury to find for [a] party, the court may . . . grant a motion for judgment as a matter of law against that party . . . ." Fed. R. Civ. P. 50(a)(1)(B). A motion for judgment as a matter of law made after conclusion of a trial is, however, nothing more than the renewal of a motion for judgment as a matter of law made before the matter was submitted to the jury. Fed. R. Civ. P. 50(b). If a party does not move for judgment as a matter of law at the close of the evidence, it may not bring such a motion after the jury returns its verdict. *See Zelinski v. Columbia 300, Inc.,* 335 F.3d 633, 638 (7th Cir. 2003) (motion for directed verdict at close of evidence is prerequisite to judgment under Rule 50(b));

11

*McCarty v. Pheasant Run, Inc.,* 826 F.2d 1554, 1555 (7th Cir. 1987) (same). *See also, Downes v. Volkswagen of America, Inc.,* 41 F.3d 1132, 1140 (7th Cir. 1994) (Seventh Circuit follows "plain language" of Rule 50 to determine whether party is precluded from seeking post-trial judgment as a matter of law).

In this case, IFC concedes that it did not move for judgment as a matter of law at the close of the evidence. Relying on a Fifth Circuit case, IFC argues that the Court can "excuse technical noncompliance" with Rule 50(b)'s requirements "when the trial court indicates that renewal of the motion would not be necessary to preserve the issues raised." Pl. Mot. at 21 (citing *Tamez v. City of San Marcos,* 118 F.3d 1085, 1090 (5th Cir. 1977)). The Court rejects this argument. First of all, the Court did not suggest to IFC that it did not need to renew its motion for judgment as a matter of law at the close of the evidence. Second, and more importantly, this is not the law in the Seventh Circuit. *See Umpleby v. Potter & Brumfield, Inc.,* 69 F.3d 209, 212 (7th Cir. 1995) (to preserve motion for judgment as a matter of law, party had to renew its motion at the close of all the evidence); *see also, Downes,* 41 F.3d at 1140.

For these reasons, the Court concludes that IFC has forfeited its right to seek judgment as a matter of law and therefore denies its motion under Rule 50.

**3.     Motion for new trial**

IFC moves for a new trial on both of its claims. It bases its motion on four contentions: (1) the Court erred by not enforcing the contracts' jury waiver clauses and allowing the case to be submitted to a jury; (2) it was inequitable for UBI to raise the fraud *in factum* defense "for the first time at trial"; (3) the Court erred by rejecting the two proposed jury instructions that IFC submitted at the final in-chambers conference; and (4) the jury's finding that fraud *in factum* was

a defense to IFC's breach of contract claim was against the manifest weight of the evidence.

### a. Jury waiver

IFC argues that the case should not have been tried to a jury because the leases included jury waiver clauses. The Court has already addressed this issue twice: first when it denied IFC's motion to strike UBI's jury demand, and second when it denied IFC's motion to reconsider that ruling.

When the matter was presented before trial, on March 20, 2006, the parties agreed that the enforceability of the contractual waiver of the right to a jury trial was governed by Illinois law. The factors considered include whether there were any negotiations concerning the jury waiver itself; the relative conspicuousness of the contractual waiver; the relative bargaining power of the parties; and whether the waiving party's counsel had an opportunity to review the agreement. *See, e.g., Tradewinds Aviation, Inc. v. Jet Support Svcs., Inc.,* No. 04 C 1406, 2004 WL 2533728, at *3 (N.D. Ill. Sept. 28, 2004); *Whirlpool Financial Corp. v. Seveaux,* 866 F. Supp. 1102, 1105 (N.D. Ill. 1994). The Court assessed each of these factors, finding that there was no indication of any negotiation about the jury waiver itself; the waiver provision was relatively inconspicuous; the contract was between two business entities; and no counsel for UBI had the opportunity to review the agreement. The Court concluded that although one of the four factors favored enforcement, the other three tipped the balance against enforcement, and it therefore denied IFC's motion to strike the jury demand. Approximately two months later, IFC moved for reconsideration, and the Court denied the motion.

IFC presents nothing new in its post-trial motion, and the Court sees no basis to revisit its earlier rulings. IFC is not entitled to a new trial on this basis.

### b. Fraud *in factum* defense

IFC argues that the Court erred in including UBI's fraud *in factum* defense in the instructions given to the jury because, it contends, UBI never raised this as an affirmative defense. IFC argues that because UBI raised the issue "at the eleventh hour," IFC was prejudiced because it did not conduct discovery on the issue.

Federal Rule of Civil Procedure 51 provides that "[a] party who objects to an instruction . . . must do so on the record, stating distinctly the matter objected to and the grounds for the objection." Fed. R. Civ. P. 51(c)(1). IFC made an objection to the fraud *in factum* defense just prior to trial and during one of the initial in-chambers jury instruction conferences. But during the final in-chambers conference, IFC's counsel suggested that the defense might, in fact, apply. After the Court recessed the conference and directed the parties to confer further, IFC submitted what its own counsel referred to as a "joint submission" including a jury instruction that allowed the jury to consider the fraud *in factum* defense. The Court specifically inquired of counsel in its return e-mail whether the jointly submitted instructions were, in fact, agreed. When given an opportunity to address the final instructions on the record the following morning, IFC's counsel stated that it was "fine with them." Trial Tr. 391 (Aug. 4, 2006).

In short, IFC has waived, or at least has forfeited, any objection to the fraud *in factum* instruction.

Even were IFC not precluded from now objecting to the fraud *in factum* instruction, it still would not be entitled to a new trial based on the giving of that instruction, because it suffered no prejudice. IFC contends, in essence, that it was shocked – shocked! – to learn a few days before trial that UBI planned to raise this defense and that the belated disclosure precluded

14

it from taking discovery on the point. But as UBI points out, during discovery and through the time of trial, UBI referred to NorVergence's alleged fraud in enticing customers to enter into transactions that differed from what they understood. UBI also raised the defense of "fraud in the inducement" in its response to IFC's motion for summary judgment, which was filed in December 2005. IFC argues that because fraud *in factum* is different from fraud in the inducement, assertion of the latter defense did not put it on notice of the former. But as another judge in this District has noted, the distinction between fraud in the inducement and fraud *in factum* is subtle: "The former induces a party to assent to something he otherwise would not have; the latter induces a party to believe the nature of his act is something entirely different than it actually is." *Chicago Area Int'l Brotherhood of Teamsters v. Watermelon Depot, Inc.,* No. 94 C 5819, 1996 WL 447254, at *5 (N.D. Ill. July 31, 1996).

In addition, IFC has made no effort to show that it would have done anything differently during discovery or trial preparation had UBI specifically identified its defense as that of fraud *in factum*. It had a full and fair opportunity to question UBI's representative who signed the leases both during discovery and at trial. IFC is not entitled to a new trial on this basis.

### c. Denial of proposed jury instructions

IFC also seeks a new trial on the ground that the Court erroneously rejected the proposed jury instructions that IFC tendered at the final in-chambers conference, to the effect that "[t]he law presumes that a party who signs a contract knows its terms and consents to be bound by them" and another stating that "[a] party's failure to read a contract does not amount to entering into a contract without knowledge of, or a reasonable opportunity to learn of, the character or essential terms of the contract." But after these instructions were discussed at the final in-

15

chambers conference, the parties were directed to attempt to arrive at agreed-upon instructions, and they did so, omitting these two proposed instructions. And when, before closing arguments, each side was given the opportunity to put on the record any objections to the instructions, IFC's counsel told the Court that IFC was "fine with them." Trial Tr. 391 (Aug. 4, 2006).

A party that objects "to an instruction or the failure to give an instructions must do so on the record, stating distinctly the matter objected to and the grounds for the objection." Fed. R. Civ. P. 51(c)(1). "The specificity requirement [of Rule 51] facilitates one of the basic purposes of Rule 51; to give district courts the opportunity to amend erroneous jury instructions, thereby avoiding the need for further review and potential retrial." *Chestnut v. Hall,* 284 F.3d 816, 819 (7th Cir. 2002). Having failed to object, and explain its objection, on the record when given the opportunity to do so, IFC is precluded from now arguing that the Court erred in failing to give the two proposed instructions.

### d. Manifest weight of the evidence

IFC argues that the jury's finding that UBI proved its fraud *in factum* defense was against the manifest weight of the evidence. The Seventh Circuit has stated that a court considering a motion for new trial on this basis may not set aside the jury's verdict "if a reasonable basis exists in the record to support the verdict, viewing the evidence in the light most favorable to the prevailing party, and leaving issues of credibility and weight of the evidence to the jury." *Kapelanski v. Johnson,* 390 F.3d 525, 530 (7th Cir. 2004). A new trial should be granted only if the verdict "is not rationally connected to the evidence, if it is born out of passion and prejudice, or if it is monstrously excessive." *Slane v. Mariah Boats, Inc.,* 164 F.3d 1065, 1067 (7th Cir. 1999). "As long as there is a reasonable basis in the record to support it, we will not overturn a

16

jury's verdict." *Robinson v. Burlington Northern R.R. Co.,* 131 F.3d 648, 656 (7th Cir. 1997).

In determining whether UBI had proved fraud *in factum,* the jury had to consider Michael Knurek's intelligence, education, business experience, and ability to understand English. In addition, the jury had to consider, among other things, evidence regarding any representations NorVergence made to Knurek about the leases; whether Knurek had good reason to rely on those representations; and any apparent necessity for Knurek to sign the leases without delay. Given these considerations, the record is replete with evidence upon which the jury reasonably could have found fraud *in factum* on the part of NorVergence. Knurek testified that he suffered from a slight learning disability, had only a GED degree, and had no experience with equipment leasing. He stated that he understood that he was signing an application for telecommunications services, the title on the cover of the papers he was given. Knurek testified that the NorVergence representative, in effect, did a fast-shuffle of the papers he was signing. Knurek was unaware that the leases contained waiver of defense and "hell or high water" provisions; indeed, the typeface was so small that he had a hard time even reading the leases. When he asked for clarification, Knurek testified, the NorVergence representative assured him that the leases were "standard." Knurek understood that he would be able to terminate the leases if the equipment did not work.

In sum, the evidence was sufficient to allow the jury reasonably to conclude that UBI had proved what was necessary to establish its fraud *in factum* defense. The Court cannot say that the jury's findings was not rationally connected to the evidence. IFC is not entitled to a new trial

on this basis.[4]

## Conclusion

For the reasons stated above, the Court grants plaintiff's motion to supplement the record [docket no. 115] but denies its motion for judgment as a matter of law and for a new trial [docket no. 117].

_____
MATTHEW F. KENNELLY
United States District Judge

Date:   December 11, 2006

---

[4] As an alternative to a new trial, IFC asks the Court to reconsider its order denying its motion for summary judgment. The Court denied that motion because the record reflected that there were genuine issues of material fact that could be determined only after a trial. There is no basis to roll the clock back to the summary judgment stage at this point. In any event, after trial a renewed request for summary judgment amounts to the equivalent of a motion for judgment as a matter of law under Rule 50, which the Court has already ruled was forfeited by IFC.